*SM Landover, LLC v. Wynton Sanders* and *SM Parkside, LLC v. Tosha Lindsey*, No. 1, September Term, 2024. Opinion by Biran, J.

**REAL PROPERTY – MD. CODE ANN., REAL PROP. ("RP") § 14-117(a)(3)(i) (2023 REPL. VOL.) – FAILURE TO DISCLOSE REQUIRED INFORMATION RELATING TO DEFERRED WATER AND SEWER FEES – ACCRUAL OF CAUSE OF ACTION –** Following its decision in *Caruso Builder Belle Oak, LLC v. Sullivan*, No. 2, Sept. Term 2024, the Supreme Court of Maryland held that Respondents/Cross-Petitioners' causes of action for violations of RP § 14-117(a)(3)(i) – failing to disclose required information relating to deferred water and sewer fees – accrued at the time of contracting, not at the time of settlement.

**BUSINESS REGULATION – MD. CODE ANN., BUS. REG. ("BR") §§ 4.5-101(g) & 4.5-301 (2015 REPL. VOL.) – HOME BUILDER REGISTRATION –** The Supreme Court held that a person that meets the definition of a "home builder" set forth at BR § 4.5-101(g) must register as a home builder, even if it only enters into contracts where at least one other party is a registered home builder. Under the Home Builder Registration Act (the "HBRA"), "a person may not act as a home builder … unless the person is registered as a home builder." BR § 4.5-301(a). The plain meaning of this provision is that before a person acts as a home builder – for example, by entering into a contract with a consumer under which the person agrees to provide the consumer with a new home, *see id.* § 4.5-101(g)(2)(iv) – the person must register as a home builder. Nothing in the plain language of the HBRA creates an exception from the registration obligation for a person who acts as a home builder with respect to a transaction where another party to the sales contract is a registered home builder. The pertinent legislative history of the HBRA confirms this interpretation of the HBRA.

**BUSINESS REGULATION – BR § 4.5-605 – ENFORCEABILITY OF CONTRACT BY UNREGISTERED HOME BUILDER –** The HBRA provides that a contract for the performance of any act for which a home builder registration number is required is "not enforceable" unless the home builder was registered at the time the homeowner signed the contract. BR § 4.5-605. The Supreme Court held that § 4.5-605 bars an unregistered home builder from invoking a contractual provision that shortens the period in which a homeowner may file a claim relating to a newly constructed home. In enacting BR § 4.5-605, the General Assembly abrogated Maryland's common law of contracts to the extent it otherwise might permit an unregistered home builder to invoke a contractual provision in defense of a claim brought against it.

IN THE SUPREME COURT

OF MARYLAND

No. 1

September Term, 2024

---

SM LANDOVER, LLC
v.
WYNTON SANDERS

and

SM PARKSIDE, LLC
v.
TOSHA LINDSEY

---

Fader, C.J.
Watts
Booth
Biran
Eaves
Wilner, Alan M.
   (Senior Justice, Specially Assigned)
Hotten, Michele D.
   (Senior Justice, Specially Assigned),

JJ.

---

Opinion by Biran, J.

---

Filed: February 4, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Under Maryland's Home Builder Registration Act (the "HBRA"), a contract for the performance of any act for which a home builder registration number is required is not "enforceable" unless the home builder was registered at the time the homeowner signed the contract. Md. Code Ann., Bus. Reg. ("BR") § 4.5-605 (2024 Repl. Vol.). In these consolidated appeals, we consider whether this statute bars an unregistered home builder from invoking a contractual provision that shortens the period in which a homeowner may file a claim relating to a newly constructed home.

The sellers of the homes at issue – Petitioners/Cross-Respondents SM Landover, LLC ("SM Landover") and SM Parkside, LLC ("SM Parkside") (together, the "Sellers") – were not registered as home builders at the time the contracts were signed. The purchasers were Respondents/Cross-Petitioners Wynton Sanders and Tosha Lindsey (together, the "Homeowners"). The contracts contained a provision stating that the parties would have up to one year in which to bring any claims relating to the contracts or the properties. In the absence of this contractual provision, the parties would have had three years in which to file such claims.

The Homeowners filed class action complaints against the Sellers more than one year after they signed their contracts, but less than one year after they settled on their new homes. In their complaints, the Homeowners asserted, among other claims, that the Sellers failed to make certain disclosures concerning deferred water and sewer charges that are required in contracts for the sale of new homes in Prince George's County. In *Caruso Builder Belle Oak, LLC v. Sullivan*, No. 2, Sept. Term 2024, we explained that a cause of action for failure to provide such disclosures ordinarily accrues at the time of contracting,

not at the time of settlement on the property. That was the case here. Thus, the Homeowners' claims are untimely under the contractual one-year limitations period unless the Sellers are barred from invoking that shortened limitations period due to their failure to register as home builders. For the reasons discussed below, we conclude that the Sellers' unregistered status indeed bars them from invoking the contractual limitations period and, therefore, that the Homeowners timely filed their claims.

# I

## Background

### A. The HBRA

The HBRA defines a "home builder" as, among other things, "a person that undertakes to erect or otherwise construct a new home" or "a person that enters into a contract with a consumer under which the person agrees to provide the consumer with a new home." BR §§ 4.5-101(g)(1), (g)(2)(iv). With exceptions not relevant here, the HBRA provides that "a person may not act as a home builder in the State unless the person is registered as a home builder[.]" *Id.* § 4.5-301(a). To obtain a registration as a home builder, a person must submit an application that contains various items of information. In addition to the applicant's name, business address, and other identifying information, the applicant must provide (among other things) a list of all states and other jurisdictions in which the applicant holds a similar registration or license or in which the applicant has had a similar registration or license revoked. *See id.* §§ 4.5-303(b)(1)-(4), (b)(7)-(8). The applicant also

must state whether any pending judgments or tax liens exist against the applicant. *Id.* § 4.5-303(b)(9).[1]

The Home Builder and Home Builder Sales Representative Registration Unit (the "Unit"), which is part of the Consumer Protection Division of the Office of the Attorney General (the "Division"), is responsible for registering and issuing a home builder registration number to an applicant that meets the requirements of the HBRA and that pays to the Division an initial nonrefundable two-year registration fee of $800. *Id.* § 4.5-304(a). The Unit may deny registration, reprimand a registrant, suspend or revoke a registration, or impose a civil penalty on a registrant if the Unit determines that the applicant or registrant has engaged in various kinds of misconduct. *See id.* § 4.5-308. It is a misdemeanor for a person to act as, offer to act as, or hold oneself out as a registrant unless the person is a registrant. *Id.* § 4.5-501(a).[2]

A registrant may renew its home builder registration for an additional two-year term if: (1) the registrant submits a renewal application to the Unit; (2) the registrant would qualify for an initial registration; (3) the registrant pays to the Division a nonrefundable renewal fee; and (4) the registrant is otherwise entitled to be registered. *Id.* § 4.5-305(c).

---

[1] In addition, an individual may not act as a sales representative for a home builder in Maryland unless the person is a registered home builder sales representative. *See* BR §§ 4.5-101(i) (defining "home builder sales representative"), 4.5-301(b) (requiring registration by persons acting as home builder sales representatives). There are no allegations in these cases concerning unregistered home builder sales representatives.

[2] The Division also may bring a civil administrative action against a person that violates BR § 4.5-501(a). *Id.* § 4.5-502.

3

The HBRA requires that a home builder provide each contract purchaser with a "consumer information pamphlet" developed by the Unit. *Id.* § 4.5-202(c). In addition, "[e]ach person that constructs new homes for sale to the public shall maintain general liability insurance for at least $100,000." *Id.* § 4.5-302(a).

The Unit maintains a list of all registered home builders. *See id.* § 4.5-202(a). Among other duties, the Unit is required to collect and maintain information on the resolution of consumer complaints involving new home builders. *Id.* § 4.5-202(d).

The Unit also administers the Home Builder Registration Fund (the "Registration Fund"). *Id.* § 4.5-203(a)(2). The Registration Fund "shall be used to cover the actual documented direct and indirect costs incurred for the administration and enforcement of the [HBRA]." *Id.* § 4.5-203(a)(3). The Division pays all registration and renewal fees it receives under the HBRA to the Comptroller of Maryland, who in turn distributes those fees to the Registration Fund. *Id.* § 4.5-203(b).

Separately, the Division maintains the Home Builder Guaranty Fund (the "Guaranty Fund"). *Id.* § 4.5-703(a)(2). Home builders are required to pay a Guaranty Fund fee per home or residential unit with each application for a permit for construction of a new home or multiple-unit development. *Id.* § 4.5-704(a)(1). The home builder pays the Guaranty Fund fee to the county or municipal corporation that is responsible for issuing the permit; the county or municipality subsequently remits the Guaranty Fund fees to the Division to be deposited in the Guaranty Fund. *Id.* §§ 4.5-704(a)(1), (a)(3). A claimant may recover compensation from the Guaranty Fund for an actual loss that results from an act or omission

4

by a registrant, as found by the Division or a court of competent jurisdiction. *Id.* § 4.5-705(a).

Importantly here, the HBRA provides that "[a] contract for the performance of any act for which a home builder registration number is required is not enforceable unless the home builder was registered at the time that the contract was signed by the owner." *Id.* § 4.5-605.[3]

## B. The Disclosure Act

As we explained in *Caruso Builder*, under Md. Code Ann., Real Prop. ("RP") § 14-117(a)(3)(i) (2023 Repl. Vol.) (the "Disclosure Act"), the initial seller of residential real property located in Prince George's County must make certain disclosures in the contract for sale if the purchaser will be obligated to pay deferred private water and sewer assessments. *See Caruso Builder*, Slip Op. at 3-4. In such a situation, the contract must disclose:

1. The existence of the deferred private water and sewer assessments;

2. The amount of the annual assessment;

3. The approximate number of payments remaining on the assessment;

4. The amount remaining on the assessment, including interest;

5. The name and address of the person or entity most recently responsible for collection of the assessment;

6. The interest rate on the assessment;

---

[3] An "owner" is defined in the HBRA to include "a person for whom a new home is built or to whom a new home is sold for occupation by … that person or the family of that person as a home[.]" *Id.* § 4.5-101(o)(1)(i).

7. The estimated payoff amount of the assessment; and

8. A statement that payoff of the assessment is allowed without prepayment penalty.

RP § 14-117(a)(3)(i).

Subsection (ii) of RP § 14-117(a)(3) prohibits a person or entity that establishes water and sewer costs for the initial sale of residential property in Prince George's County from "amortiz[ing] costs that are passed on to a purchaser by imposing a deferred water and sewer charge for a period longer than 20 years after the date of the initial sale." *See Elsberry v. Stanley Martin Cos., LLC*, 482 Md. 159 (2022). Violation of RP § 14-117(a)(3) entitles the purchaser to:

(i)   Recover from the seller the total amount of deferred charges the purchaser will be obligated to pay following the sale;

(ii)   Recover from the seller any money actually paid by the purchaser on the deferred charge that was lost as a result of a violation of subsection (a)(3) of this section; or

(iii) If the violation is discovered before settlement, rescind the real estate contract without penalty.

RP § 14-117(b)(2).

### C. Factual Background

#### 1. The Sanders Contract

On April 8, 2018, Mr. Sanders signed a New Home Sales Contract (the "Sanders Contract") for the construction and sale of a new home in Landover, Maryland. Mr. Sanders was defined in the agreement as "Purchaser." The other parties to the Sanders Contract were SM Landover, which was defined as "Seller," and Stanley Martin Companies, LLC ("SMC"), which was defined as "Builder." The Sanders Contract contained a paragraph

6

entitled "**ESTIMATED DEFERRED WATER AND SEWER CHARGE DISCLOSURES**," which stated, among other things, that Mr. Sanders "will become liable" for deferred water and sewer charges estimated to be $484 annually for 30 years. The Sanders Contract contained an addendum entitled "NOTICE TO PURCHASER OF DEFERRED WATER AND SEWER CHARGES," which Mr. Sanders also signed on April 8, 2018. Among other things, this notice stated that "the total Water and Sewer Charges (exclusive of interest, costs, late fees, and attorneys' fees) shall be … $14,520.00 … ($484.00 x 30)[.]" The notice also stated that "[t]he estimated payoff amount of the Water and Sewer Charges is $14,240[.]"

The Sanders Contract also contained an addendum entitled "First-Time Maryland Home Buyer Transfer and Recordation Tax Addendum" (the "First-Time Buyer Addendum") that required Mr. Sanders solely to bear the cost of the recordation tax and local transfer tax due at closing. In addition, the Sanders Contract contained a provision stating that "[a]ny and all disputes and/or claims … relating to this Contract or the Property … shall be governed by a one (1) year statute of limitations, notwithstanding the period of limitations that would otherwise be applicable."

The settlement on Mr. Sanders's home occurred on November 15, 2018.

2. The Lindsey Contract

On April 30, 2018, Ms. Lindsey signed a New Home Sales Contract (the "Lindsey Contract") for the construction and sale of a new home in Upper Marlboro, Maryland. Ms. Lindsey was defined in the agreement as "Purchaser." The other parties to the Lindsey Contract were SM Parkside, which was defined as "Seller," and SMC, which was defined

as "Builder." Like the Sanders Contract, the Lindsey Contract contained a paragraph entitled **"ESTIMATED DEFERRED WATER AND SEWER CHARGE DISCLOSURES**." This paragraph stated, among other things, that Ms. Lindsey "will become liable" for deferred water and sewer charges estimated to be $600 annually for 30 years. The Lindsey Contract also contained an addendum entitled "NOTICE TO PURCHASER OF DEFERRED WATER AND SEWER CHARGES," which Ms. Lindsey signed on April 30, 2018. Consistent with the provision concerning deferred water and sewer charges in the body of the Lindsey Contract, this notice stated that Ms. Lindsey would be responsible for an annual assessment of $600 for deferred water and sewer charges for a period of 30 years.

Like the Sanders Contract, the Lindsey Contract contained a provision stating that "[a]ny and all disputes and/or claims … relating to this Contract or the Property … shall be governed by a one (1) year statute of limitations, notwithstanding the period of limitations that would otherwise be applicable."

The settlement on Ms. Lindsey's home occurred on December 17, 2018.

### D. Procedural History

Mr. Sanders filed his initial complaint against SM Landover on May 21, 2019. In his second amended complaint, Mr. Sanders alleged on behalf of a putative class that SM Landover failed to disclose: (1) that there was a six percent interest rate on the assessed water and sewer charges, in violation of RP § 14-117(a)(3)(i)(6); and (2) the estimated payoff amount of the assessment, in violation of RP § 14-117(a)(3)(i)(7). The second amended complaint also alleged that SM Landover violated RP § 14-117(a)(3)(ii) by

8

imposing a water and sewer charge for a period of 30 years, contrary to § 14-117(a)(3)(ii)'s prohibition against amortizing water and sewer costs for a period longer than 20 years after the date of the initial sale.

Mr. Sanders also asserted claims for Money Had and Received and for a violation of the Maryland Consumer Protection Act, Md. Code Ann., Comm. Law § 13-303 (2013 Repl. Vol.) (the "MCPA"). The Money Had and Received claim concerned the First-Time Buyer Addendum under which Mr. Sanders paid the entire amount of State recordation tax and local transfer tax that was due at closing. Under RP § 14-104(c)(1), "[t]he entire amount of recordation tax … shall be paid by the seller of improved, residential real property that is sold to a first-time Maryland home buyer who will occupy the property as a principal residence, unless there is an express agreement between the parties to the agreement that the recordation tax and local transfer tax will not be paid entirely by the seller." As discussed above, the First-Time Buyer Addendum to the Sanders Contract contained an express agreement under which Mr. Sanders was solely responsible for paying the recordation tax and local transfer tax. In his complaint, Mr. Sanders alleged that SM Landover was not registered as a "home builder" under the HBRA and, therefore, under BR § 4.5-605, could not enforce the First-Time Buyer Addendum against him and similarly situated class members.[4]

_____

[4] In the Money Had and Received claim, Mr. Sanders alleged that class members who are not first-time Maryland home buyers are entitled to recover from SM Landover half of the total amount of State transfer tax, local transfer tax, and recordation tax they paid at settlement. Under RP § 14-104(b), with respect to sales or other dispositions of real property to non-first-time Maryland home buyers, in the absence of a contrary provision in the contract or the law, it is presumed that the parties to the agreement intended that the

The MCPA claim alleged that SM Landover falsely represented and knowingly concealed the material fact that it was not registered as a home builder under the HBRA. As a proximate result of this alleged unfair and deceptive practice, Mr. Sanders and other class members allegedly "suffered damages, including, but not limited to, the payment of State transfer tax, local transfer tax, and recordation tax at settlement pursuant to the unenforceable contracts entered into with SM Landover."

Ms. Lindsey filed her initial complaint against SM Parkside on May 21, 2019. In her third amended complaint, Ms. Lindsey alleged on behalf of a putative class that SM Parkside failed to disclose: (1) the amount remaining on the assessment of deferred water and sewer charges, in violation of RP § 14-117(a)(3)(i)(4); (2) that there was a six percent rate of interest on the water and sewer assessment, in violation of RP § 14-117(a)(3)(i)(6); (3) the estimated payoff amount of the water and sewer assessment, in violation of RP § 14-117(a)(3)(i)(7); and (4) that payoff of the assessment was allowed without prepayment penalty, in violation of RP § 14-117(a)(3)(i)(8). The third amended complaint further alleged that, "[d]espite operating as a home builder in Maryland, SM Parkside is not, nor has it ever been, registered as a home builder under [the HBRA]," and, therefore, under BR § 4.5-605, "every contract that SM Parkside entered into with a consumer under which it agreed to provide the consumer with a new home, is not, and was not, enforceable" by SM Parkside/SMC.

---

cost of any recordation tax or any State or local transfer tax shall be shared equally between the grantor and the grantee.

The circuit court consolidated these cases for pretrial purposes,[5] and eventually granted the Sellers' motions to dismiss the Homeowners' complaints with prejudice. The court found significant that SMC registered as a home builder and was a party to the contracts; therefore, according to the circuit court, the Sellers did not also have to register under the HBRA. In addition, the circuit court concluded that the Homeowners' disclosure claims accrued at the time of contracting, not at the time of settlement. Because the Homeowners filed their complaints more than one year after they entered into their contracts, the circuit court held that the claims were time-barred. With respect to Mr. Sanders's claims for Money Had and Received and for a violation of the MCPA, the circuit court concluded that the contracts were "fully performed," meaning that Mr. Sanders and other putative class members "got the benefits of their bargains," and therefore had "no right to a rebate of any taxes or share of taxes that were paid."

The Appellate Court of Maryland affirmed in part and reversed in part. *Sanders v. SM Landover, LLC*, Nos. 1876, 1880, and 1884, Sept. Term, 2021, 2023 WL 1097343 (Jan. 30, 2023). Pertinent here, the Appellate Court first held that the contractual one-year period of limitations was reasonable and not void as against public policy. *Id.* at *6. In addition, the court discerned no fraud, duress, or any other unconscionable conduct with respect to the contracts. *See id.* Thus, the Appellate Court held that, in order for the Homeowners'

---

[5] For this reason, in this opinion we will at times refer to these appeals as one "case." A third putative class action against SMC and a different seller entity was also consolidated with the cases brought by Mr. Sanders and Ms. Lindsey for pretrial purposes in the circuit court and on appeal before the Appellate Court of Maryland. That third case is not before us.

11

claims for failure to properly disclose the deferred water and sewer charges to be timely, the Homeowners must have filed those claims within one year after the claims accrued, rather than three years after accrual under Maryland's default civil statute of limitations.[6] *Id.*[7]

Regarding accrual, the Appellate Court held that the Homeowners' claims for violation of the Disclosure Act accrued, at the earliest, following the settlements on the sales, when the Homeowners took possession of their homes along with the responsibility for water and sewer charges. *Id.* at *7. Because the Homeowners filed their lawsuits less than one year after they settled on their new homes, the Appellate Court held that the circuit court erred in dismissing their disclosure claims as time-barred. *Id.* at *8.

With respect to Mr. Sanders's other claims, the Appellate Court first determined that SM Landover qualified as a "home builder" under the HBRA. *Id.* at *9. However, because SMC was also a party to the Sanders Contract and because SMC was registered as a home builder under the HBRA, the Appellate Court concluded that the First-Time Buyer Addendum was enforceable. *Id.* at *10. According to the Appellate Court, it followed that the default tax allocations in RP § 14-104(c)(1) do not apply because of the express agreement in the Sanders Contract, and it was proper for Mr. Sanders to pay the recordation

---

[6] "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 5-101 (2020 Repl. Vol.).

[7] In their cross-petition for certiorari, the Homeowners did not seek further review of this portion of the Appellate Court's opinion. Thus, the validity of the one-year contractual limitations period is not before us.

tax and local transfer tax at settlement. *Id.* The court also held that Mr. Sanders could not prevail on a claim for Money Had and Received where SM Landover had fully performed on the contract and Mr. Sanders had received full value. *Id.* For these reasons, the Appellate Court affirmed the dismissal of Mr. Sanders's claim for Money Had and Received. *Id.* at *11.

Finally, the Appellate Court held that the circuit court properly dismissed Mr. Sanders's MCPA claim. *Id.* The court noted that Mr. Sanders did not allege any defect in the construction of his home, nor did he allege that SM Landover's status as an unregistered home builder impaired or prejudiced any of his rights under the MCPA. *Id.* The only injury Mr. Sanders alleged in his MCPA claim was the payment of the recordation tax and local transfer tax, which he asserted he would not have paid had he known that SM Landover was not registered as a home builder. *Id.* The Appellate Court held that this allegation of damages failed to state a claim under the MCPA: "The recordation tax and local transfer tax are not 'damages' but rather part of the consideration [Mr. Sanders] paid for [his] home[]." *Id.*

On February 7, 2023, the Sellers filed a petition for writ of certiorari seeking review of that portion of the Appellate Court's opinion which held that the Homeowners' causes of action for the alleged disclosure violations accrued at the time of settlement, as opposed to the time of contracting. In their petition, the Sellers noted that *Caruso Builder*, which raised the same accrual issue, was then pending before the Appellate Court. On February 22, 2023, the Homeowners filed a cross-petition for certiorari. We held the petition and cross-petition pending the Appellate Court's decision in *Caruso Builder*. The Appellate

13

Court issued its decision in *Caruso Builder* on January 31, 2024. On February 16, 2024, we granted both the petition and cross-petition in this case. *SM Landover, LLC v. Sanders*, 486 Md. 387 (2024). On the same date, we granted a writ of certiorari in *Caruso Builder*. We also directed that this case and *Caruso Builder* be set for argument on the same day.

Between the two petitions filed in this case, we agreed to review the following questions:[8]

1. When does a cause of action accrue under [RP § 14-117(a)(3)(i)] for failing to include in the initial contract of sale statutory disclosures relating to deferred water and sewer charges?

2. Whether a person who is a "home builder" under BR § 4.5-101 is relieved of their duty to register as a "home builder" when a different registered home builder is a party to the same contract?

3. In an action brought by a homeowner under RP § 14-117(a)(3), may an unregistered home builder assert a timeliness defense based on the failure of the homeowner to bring the action within a contractually agreed-upon limitations period?

---

[8] The Sellers raised the first question in their petition. The Homeowners raised the second and third questions in their cross-petition. The cross-petition phrased the third question as: "Whether an unregistered person that contracts to perform any act for which a home builder registration number is required may enforce a contract against a purchaser in direct contravention of BR § 4.5-605 where a registered home builder who contracts to perform different acts under the contract is a party to the same contract?" This formulation seemingly is broad enough to encompass an argument seeking reversal of the Appellate Court's judgment with respect to Mr. Sanders's claim for Money Had and Received and perhaps also with respect to Mr. Sanders's MCPA claim. However, neither the Money Had and Received claim nor the First-Time Buyer Addendum was mentioned in the cross-petition or in the Homeowners' briefing in this Court. Nor did the Homeowners mention Mr. Sanders's MCPA claim in their certiorari petition or in their briefing. Thus, we conclude that Mr. Sanders has abandoned his Money Had and Received claim and his MCPA claim. We have rephrased the third question to correspond to the Homeowners' arguments before us.

14

## II

### Standard of Review

The questions listed above are questions of law, which we consider *de novo*. *See, e.g.*, *Elsberry*, 482 Md. at 178.

## III

### Discussion

#### A. Accrual of a Cause of Action under RP § 14-117(a)(3)(i)

The Sellers argue that the Appellate Court incorrectly held that claims for violations of the disclosure requirements of RP § 14-117(a)(3)(i) accrue at the time of settlement. According to the Sellers, the occurrence of the Homeowners' informational injuries – not the relief requested – dictates the accrual date of the Homeowners' claims. The Homeowners, on the other hand, contend that their disclosure claims accrued at the time of settlement, not at the time they entered into the contracts of sale.

Our decision in *Caruso Builder* resolves this question in favor of the Sellers. In *Caruso Builder*, we explained that a cause of action for a violation of RP § 14-117(a)(3)(i) ordinarily accrues at the time the contract for initial sale of residential real property is executed, not at the time of settlement. *See Caruso Builder*, Slip Op. at 22-23. We held that this was the case with respect to the plaintiff's claim because it was undisputed that, at the time of contracting, the plaintiff had received a disclosure concerning the deferred water and sewer charges. *Id.* at 24. After receiving the allegedly deficient disclosure on the date she contracted for the home, the plaintiff was on inquiry notice of a potential violation of the Disclosure Act. *Id.* In addition, the plaintiff had at least one viable statutory remedy

available to her as of that date. *Id.* Thus, we concluded that the plaintiff's claim accrued on the date of contracting, not on the date of settlement. *Id.*

On this point, the Homeowners' claims are materially indistinguishable from those of the plaintiff in *Caruso Builder*. The Homeowners received allegedly deficient disclosures concerning deferred water and sewer charges at the time of contracting. We conclude that the Homeowners were on inquiry notice of the violations of the Disclosure Act, and that they had at least one viable statutory remedy available to them, as of that date. Thus, the Homeowners' claims under the Disclosure Act accrued at the time of contracting, not at the time of settlement. Because the Homeowners filed their claims under RP § 14-117(a)(3)(i) more than one year after they entered into their contracts, their actions are time-barred *unless* the Sellers are barred from invoking the one-year contractual limitations period due to their failure to register as home builders under the HBRA. We now turn to the registration-related questions in this appeal.[9]

---

[9] The parties dispute whether the Sellers have raised a question concerning the accrual of Mr. Sanders's claim for a violation of RP § 14-117(a)(3)(ii) – the prohibition on amortizing deferred water and sewer assessments beyond 20 years. We need not delve into that preservation question. If we assume that the Sellers have placed the viability of the amortization claim before us, and if we further assume that the amortization claim accrued at the time of contracting, *see Caruso Builder*, Slip Op. at 22 n.13 (observing that "[b]ecause subsection (a)(3)(i) requires a seller to disclose, among other things, the 'approximate number of payments remaining on the assessment[,]' it will be immediately apparent whether a disclosure also has violated subsection (a)(3)(ii)"), our holding that the Sellers may not invoke the contractual one-year limitations period as a defense to the Homeowners' disclosure claims applies equally to Mr. Sanders's amortization claim.

16

**B. The Sellers Were Not Permitted to Act as Home Builders Without Registering under the HBRA.**

The Sellers do not dispute that they meet the HBRA's definition of a "home builder," nor could they reasonably do so. The Sellers are "home builders" under the definition of that term set forth at BR § 4.5-101(g)(2)(ii): "a new home builder subject to § 10-301 of the Real Property Article." A new home builder is subject to RP § 10-301 if: (1) there is a sale and purchase of a new single-family residential unit; (2) construction on the unit has either not begun or has not been finished at the time of contracting the sale; (3) the vendor or builder obligates the purchaser to pay a sum of money; and (4) the vendor or builder receives any sum of money before the completion of construction and grant of the realty to the purchaser.

Here, in connection with the sale and purchase of new, single-family homes, before construction had started or was completed, the Sellers required the Homeowners to execute an "Earnest Money Deposit Agreement," and the Homeowners signed a "Promissory Note" to pay the Sellers the deposit amounts specified in the contracts. Thus, the four elements subjecting the Sellers to RP § 10-301 were satisfied.

The Sellers also qualify as home builders under the alternative definition of a "home builder" in BR § 4.5-101(g)(2)(iv): "a person that enters into a contract with a consumer under which the person agrees to provide the consumer with a new home." The Sanders Contract and the Lindsey Contract make clear that the Sellers agreed to provide the Homeowners with their new homes.

Notwithstanding their admitted status as "home builders," the Sellers argue that they were not required to be registered as home builders in order to sell the Homeowners their new homes. According to the Sellers, because SMC – a registered home builder – was a party to both contracts, the HBRA did not require the Sellers also to be registered home builders before they entered into the contracts to sell the properties and before they accepted deposits from the Homeowners. The Sellers base their reading of the HBRA on the language of BR § 4.5-605, which is phrased in the singular: "A contract for the performance of any act for which *a home builder registration number* is required is not enforceable unless *the home builder* was registered at the time that the contract was signed by the owner." (Emphasis added). According to the Sellers, the plain language of this section of the HBRA indicates that the General Assembly only contemplated there being a single registered "home builder" in any particular sales contract.

The Sellers contend that this reading of the HBRA is consistent with the purpose of the statutory scheme, which is to protect purchasers of new homes. As long as one party to a sales contract is registered, the Sellers argue, that purpose is met. As support for this proposition, the Sellers point out, among other things, that SMC provided the Homeowners with the consumer information pamphlet required under BR § 4.5-202(c)(3); maintained general liability insurance for at least $100,000 as required under BR § 4.5-302(a); and paid the fees required under BR § 4.5-704(a)(1) into the Guaranty Fund. Thus, the Sellers argue, SMC's status as (1) a registered home builder and (2) a party to the sales contracts fully satisfied the requirements of the HBRA.

The Homeowners disagree with this interpretation of the HBRA. They observe that the Sellers performed acts for which a home builder registration is required (accepting deposits from purchasers prior to completion of their homes and entering into contracts to provide new homes to the purchasers), and that the Sellers do not fall into any of the exceptions to the definition of "home builder" set forth at BR § 4.5-101(g)(3).[10] The Homeowners rely on the principle of statutory construction known as "*expressio unius est exclusio alterius*" – the expression of one thing is the exclusion of another. *See, e.g.*, *Walzer v. Osborne*, 395 Md. 563, 579 (2006). Thus, according to the Homeowners, if the General Assembly had intended to exempt an entity that otherwise meets the definition of "home builder" from registering as a home builder to the extent it is a party to a contract with another person that is a registered "home builder," it would have expressly done so. In

___

[10] Section 4.5-101(g)(3) provides that the term "home builder" does not include:

(i)     an employee of a registrant who does not hold himself or herself out for hire in home building except as an employee of a registrant;

(ii)    subcontractors or other vendors hired by the registrant to perform services or supply materials for the construction of a new home who do not otherwise meet the requirements of this title;

(iii)   the manufacturer of industrialized buildings intended for residential use or of mobile homes, unless the manufacturer also installs the industrialized buildings or mobile homes;

(iv)    a real estate developer who does not construct, or enter into contracts with consumers to provide or construct, homes;

(v)     a financial institution that lends funds for the construction or purchase of residential dwellings in the State;

(vi)    except as otherwise provided in this title, a person who erects or constructs new homes solely in Montgomery County; or

(vii)   a buyer's agent, as defined in § 17-530 of the Business Occupations and Professions Article, when representing a prospective buyer in the purchase of a new home.

addition, the Homeowners argue that the Sellers' interpretation would undermine the

purposes of the HBRA and render many of its provisions superfluous and nugatory.

Resolution of the parties' competing contentions requires us to interpret various

provisions of the HBRA. As we have stated previously,

> [t]he goal of statutory interpretation is to "ascertain and effectuate the actual intent of the General Assembly in enacting the law under consideration." *Matter of Collins*, 468 Md. 672, 689 (2020). In conducting this inquiry, "we begin with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (internal quotation marks and citations omitted). If the statutory language is "unambiguous and clearly consistent with the statute's apparent purpose, [the] inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). We "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application." *Id.* (internal quotation marks and citations omitted). Rather, we construe the statute "as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316 (2006). We do not "read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Lockshin*, 412 Md. at 275. "Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276. We presume "that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* To the extent there is ambiguity in statutory language, we strive to resolve it by "searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Id.* We also often review legislative history to determine whether it confirms the interpretation suggested by our analysis of the statutory language. *See, e.g., In re O.P.*, 470 Md. 225, 255 (2020). Further, we "check our interpretation against the consequences of alternative readings of the text," *Bell v. Chance*, 460 Md. 28, 53 (2018), which "grounds the analysis." *In re O.P.*, 470 Md. at 255. Doing so helps us

"avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense," *Mayor & Town Council of Oakland*, 392 Md. at 316; *see also Bell*, 460 Md. at 53 (explaining that, throughout the statutory interpretation process, "we avoid constructions that are illogical or nonsensical, or that render a statute meaningless").

*Pabst Brewing Co. v. Frederick P. Winner, Ltd.*, 478 Md. 61, 75-76 (2022) (paragraph break omitted).

For the reasons stated below, we agree with the Homeowners that a person that meets the definition of a "home builder" set forth at BR § 4.5-101(g) must register as a home builder, even if it only enters into contracts where at least one other party is a registered home builder.

1. The Plain Language of the HBRA

Under the HBRA, "a person may not act as a home builder … unless the person is registered as a home builder under this title." BR § 4.5-301(a). The plain meaning of this provision is that before a person acts as a home builder – for example, by entering into a contract with a consumer under which the person agrees to provide the consumer with a new home, *see id.* § 4.5-101(g)(2)(iv) – the person must register as a home builder.

As noted above, some persons who have connections to the residential real estate market or the construction process do not qualify as "home builders" under the HBRA. *See, e.g., id.* § 4.5-101(g)(3)(v) (excluding a financial institution that lends funds for the construction or purchase of a residential dwelling). Those excluded persons do not "act" as "home builders." That is, they do not enter into contracts with consumers to provide new homes to the consumers, they do not accept deposits from consumers before completion of construction, etc. Thus, the HBRA draws a line of demarcation between those who act as

21

home builders and those who do not. Only those persons who act as home builders must register as home builders.

Conversely, nothing in the plain language of the HBRA creates an exception from the registration obligation for a person who acts as a home builder with respect to a transaction where another party to the sales contract is a registered home builder. Where, as here, one party to the sales contract agrees to provide the new home to the purchaser and/or will receive a deposit from the purchaser prior to completion of construction, and another party to the contract agrees to construct the home, both persons are acting as "home builders" within the meaning of the HBRA. In that scenario, the plain language of the HBRA requires both persons to register as home builders.

As noted above, the Sellers' textual argument to the contrary is based on BR § 4.5-605, which is phrased in the singular: "A contract for the performance of any act for which a home builder registration number is required is not enforceable unless the home builder was registered at the time that the contract was signed by the owner." We are not persuaded that this language reflects an intent by the General Assembly to exempt from registration those who act as home builders with respect to a particular transaction where another party to the contract is a registered home builder. If the General Assembly had intended to create such an exemption, we expect it would have phrased it specifically in terms of registration and would have placed it either in the section of the HBRA that addresses registration or in the section that excludes certain persons from the definition of "home builder." *See Webb v. Johnson*, 195 Md. 587, 599 (1950) ("If the Legislature had so intended, it would have been easy to put such an exception in the Act."); *Meadowlark Ins. Co. v. Ins. Comm'r of*

22

*State of Md.*, 101 Md. App. 379, 389 (1994) ("Had the legislature intended to exempt every industrial insurer from the certificate of authority requirement, such an exemption would surely have been inserted in § 43.").

Moreover, we disagree with the Sellers' reading of BR § 4.5-605. They interpret it to contemplate that, as long as any party to a new-home sales contract is registered as a home builder at the time the owner signs, an unregistered person may perform an act that would otherwise require the person to possess a home builder registration number. But § 4.5-605 does not refer to "any" home builder, but rather to "the" home builder. This suggests the General Assembly contemplated that the home builder who would be obligated under the contract "for the performance of any act for which a home builder registration number is required" and "the home builder" who "was registered at the time that the contract was signed by the owner" would be one and the same.

2. Legislative History

We often review legislative history to determine whether it confirms the construction suggested by our analysis of the statutory language. *See, e.g.*, *In re O.P.*, 470 Md. at 255. The pertinent legislative history of the HBRA supports our interpretation of its plain language.

The study group appointed to address the issue of registering home builders listed six criteria for legislation on the issue: "(1) protection and recourse against financially unstable home builders that might hide behind bankruptcy protection, and re-emerge under a different corporate name, in a different jurisdiction; (2) protection and recourse against any non-compliance with rigorous performance standards; (3) the development of a

23

regulatory system that will provide the greatest amount of consumer protection with the least amount of regulatory burden on good home builders; (4) the creation of an effective and efficient regulatory system that could ensure equitable standards and enforcement statewide; (5) the allowance for certain existing local regulatory schemes that are equally protective of consumers; and (6) a regulatory mechanism that provides protection for subcontractors who are impacted by financially unstable home builders." Senator Delores Kelley, Testimony Before the Senate Finance Committee Regarding Senate Bill 380 – Maryland Home Builders Registration Act, at 2 (March 8, 2000).

The revised fiscal note for the bill stated that the legislation "requires a person to register and obtain a home builder's registration number in order to act as a home builder[.]" Revised Fiscal Note, S.B. 380 (2000 Sess.), at 1; *see also* Floor Report, S.B. 380 (2000 Sess.), at 1 ("The bill requires an individual, who acts as a home builder in the State, to be registered with the Office of the Attorney General, Division of Consumer Protection."); Senate Finance Committee, Conference Committee Report, S.B. 380 (2000 Sess.) (stating that "Senate Bill 380 requires a person engaging in the home building business to be registered by the Consumer Protection Division of the Attorney General's Office") (capitalization omitted); Economic Matters Committee, Bill Analysis, S.B. 380 (2000 Sess.), at 1 (describing the bill generally as "requir[ing] a person or firm engaging in the home building business to be registered by the Consumer Protection Division of the Office of the Attorney General"); Department of Labor, Licensing, and Regulation, Letter in Support of S.B. 380 (2000 Sess.), at 2 (in supporting the legislation, explaining that

registering home builders will allow the "track[ing of] so-called 'bad builders' and prevent them from continuing to operate in the State").

Nothing in the legislative history concerning the original enactment of the HBRA even hints that the General Assembly intended to exempt any person from registration who acts as a home builder. To the contrary, the legislative history makes clear that the General Assembly considered the HBRA to be a consumer protection statute and that it believed that requiring any person who acts as a home builder to register furthered the goal of consumer protection.

The revised fiscal note also discussed the Registration Fund, which the bill established "to cover the actual documented direct and indirect costs of fulfilling the statutory and regulatory duties of the [Unit]." Revised Fiscal Note, S.B. 380 (2000 Sess.), at 2. The fiscal note continued: "There are approximately 900 home builders in the State, and it is expected that all will be licensed in fiscal 2001. In order to keep the [Unit] self-financing, each builder will need to pay approximately $500 in licensing fees." *Id.* at 3. Each home builder's registration is thus assumed under the funding scheme of the bill. Nothing in the legislative history suggests that the General Assembly believed that the proper level of funding would be achieved if it exempted from registration any persons who act as home builders in the State.

The original version of the HBRA did not include in the definition of "home builder" a "person that enters into a contract with a consumer under which the person agrees to provide the consumer with a new home." BR § 4.5-101(g)(2)(iv). The General Assembly added that provision to the HBRA in 2011 in response to this Court's decision in *Bayly*

25

*Crossing, LLC v. Consumer Protection Division, Office of Attorney General*, 417 Md. 128 (2010). There, Bayly Crossing, LLC ("Bayly") entered into contracts with various buyers to produce new homes on undeveloped lots. *Id.* at 131. Because Bayly was not a registered home builder in Maryland, the contracts specified that Bayly would subcontract with T.B. Passyn & Sons, Inc. ("Passyn"), a registered home builder, to construct the homes. *Id.* In an addendum to the contract, buyers were advised that Passyn "is the Builder for [their] house ... and hereby agrees to grant to the Buyers of said house a One-Year Limited Warranty[.]" *Id.* at 132. The contracts were executed by one of the owners of Bayly, while the addendum was signed by a representative of Passyn. *Id.*

In 2005, the Division filed a Statement of Charges against Bayly and its owners, alleging violations of the HBRA and MCPA. The charges were based on the allegation that Bayly was acting as a home builder without properly registering as such. *Id.* at 133. The Division argued that the HBRA's definition of "home builder" as one who "undertakes to erect or otherwise construct a new home" includes those who appear to contract to build new homes, but who, in fact, do not. *Id.* at 141.

This Court disagreed, holding that Bayly was not a "home builder" because it did not undertake to construct the new homes. That was Passyn's responsibility, as stated in the contracts and the addendum. *See id.* at 141-43. Accordingly, this Court held that Bayly was not required to register as a home builder. *Id.*

The General Assembly reacted swiftly to *Bayly Crossing*. In the 2011 legislative session, the General Assembly amended the HBRA to add as a "home builder" a "person that enters into a contract with a consumer under which the person agrees to provide the

26

consumer with a new home." *See* 2011 Md. Laws 241-42 (ch. 43); 2011 Md. Laws 242-44 (ch. 44),[11] *codified* at BR § 4.5-101(g)(2)(iv).

The fiscal and policy note for the amendment provided the following background concerning *Bayly Crossing*:

> In a November 2010 decision, the [Supreme Court of Maryland] held that a real estate developer who entered into a contract with a buyer to provide a new home was not required to be registered as a home builder because the contract specified that a third party – a registered home builder – was responsible for constructing the home. *Bayly Crossing, LLC, et al. v. Consumer Protection Division, Office of the Attorney General*, 417 Md. [1]28 (2010). Under the bill, a real estate developer or any other person who enters into such a contract with a consumer must be registered as a home builder.

Fiscal and Policy Note, S.B. 256 (2011 Sess.), at 2. According to the fiscal and policy note, the bill "clarifie[d] that a home builder does not include … a real estate developer who does not undertake home construction or enter into contracts with consumers to construct homes[.]" *Id.* at 1.

The Division, as *amicus curiae* in this case, argues that the General Assembly's addition of BR § 4.5-101(g)(2)(iv) in response to *Bayly Crossing* demonstrates that the General Assembly intended to require selling entities (such as the Sellers here) to register as home builders, whether or not a registered home builder is also a party to the contract as the person that is obligated to construct the new home. According to the Division, the General Assembly sought to ensure that purchasers: (1) do not lose deposits paid to

---

[11] For a discussion of the effect of a Governor signing both cross-filed bills into law, see *Wheeling v. Selene Fin. LLP*, 473 Md. 356, 405 n.2 (2021) (Getty, J., concurring in part and dissenting in part).

unregistered sellers; and (2) are not placed into transactions in which registered sellers take their money and unregistered, undercapitalized builders are left with warranty obligations that the builders cannot meet.

The Sellers disagree with the Division's interpretation of the General Assembly's reaction to *Bayly Crossing.* They note that Passyn was not a party to the contracts between Bayly and the consumers. According to the Sellers, the General Assembly's goal in amending the definition of "home builder" in the aftermath of *Bayly Crossing* was to ensure that at least one registered home builder is a party to every new home sales contract. They contend that the General Assembly did not contemplate a situation where two entities that qualify as "home builders" would be parties to the same contract. Therefore, the Sellers claim, we cannot conclude from the addition of selling entities to the definition of "home builder" that the General Assembly intended to prohibit unregistered selling entities from acting as "home builders" where a registered home builder is also a party to the sales contract.

We agree with the Division's interpretation of the 2011 amendment to the definition of "home builder." Although Passyn – the registered home builder in *Bayly Crossing* – was not a party to the sales contracts at issue in that case, Passyn's role as the builder was disclosed in the contracts, and it executed the addendum to the sales contracts. Nothing in the language of the 2011 amendment or its legislative history suggests that, if Passyn had been a party to the contracts, the General Assembly would have approved of Bayly acting as the selling entity without registering as a home builder.

The amendment "clarifie[d] that a home builder does not include … a real estate developer who does not undertake home construction or enter into contracts with consumers to construct homes[.]" Fiscal and Policy Note, S.B. 256 (2011 Sess.), at 1. Thus, if a real estate developer (or any other person) *does* do one of those two things – undertakes construction of the home *or* enters into a contract with a consumer to construct a new home, that person is required to register as a home builder.

In sum, the pertinent legislative history confirms that, where a person who agrees to sell a new home to a consumer is not the same person who will undertake the actual construction of the home, both the seller and the builder must register under the HBRA. The HBRA was enacted as a consumer protection statute. To that end, the General Assembly intended that every "home builder" in the State would register, except for those expressly exempted from the statute. When a loophole was exposed in *Bayly Crossing*, the General Assembly amended the HBRA to require sellers to register as home builders. Nothing in the legislative history suggests that the General Assembly intended selling entities such as the Sellers here to register only where: (1) the builder is not the same person as the seller; and (2) the builder is not a party to the sales contract.

3. The Sellers' Interpretation Would Lead to Absurd Results.

Finally, the Sellers' interpretation of the HBRA would lead to absurd results. The logical conclusion of the Sellers' argument is that a person who undertakes to construct a new home does not need to register as a home builder as long as the person who agrees to provide the home to the consumer is registered, and both the builder and the seller are parties to the contract. Among other problems, this would allow the builder to avoid the

requirement under the HBRA to maintain at least $100,000 in general liability insurance. We doubt that, in closing one loophole by adding sellers to the definition of "home builders," the General Assembly intended to open another loophole, *i.e.*, allowing builders to avoid registration by having an affiliated selling entity register as a home builder. In addition, we see no reason to believe that, when the General Assembly added sellers to the definition of "home builder," it was any less concerned about tracking "bad" sellers than it was about tracking "bad" builders, and vice versa. Adopting the Sellers' interpretation would make it easier for unethical players in the residential construction industry to use registered affiliates to avoid registration themselves, and thereby make it harder for the Division to track and sanction them. That is not what the General Assembly had in mind when it enacted the HBRA.

-----

The Sellers were required to register because they meet the definition of a "home builder" under the HBRA. The fact that SMC was registered does not mean that the Sellers could act as home builders without being registered.

### C. An Unregistered Home Builder May Not Invoke a Contractually Agreed-Upon Period of Limitations.

The Sellers argue that, even if they were required to register as home builders under the HBRA, they may nevertheless invoke the one-year contractual limitations period to assert a defense of untimeliness in the Homeowners' lawsuits. The Sellers argue that BR § 4.5-605 only bars an unregistered home builder from *enforcing* a new home sales contract, not from invoking a contract or its terms in defense of claims brought against

them. According to the Sellers, the Homeowners cannot avoid their contractual commitments because the contracts have been fully executed.

The Homeowners counter that, under the plain language of BR § 4.5-605, the Sellers cannot enforce the one-year limitations period contained in their sales contracts, and that invoking the limitations period is synonymous with enforcing it. We agree with the Homeowners.

Again, BR § 4.5-605 provides that "[a] contract for the performance of any act for which a home builder registration number is required is not enforceable unless the home builder was registered at the time that the contract was signed by the owner." The HBRA does not define the terms "enforceable" or "enforce." "[W]here a term is not defined by statute, we may refer to the dictionary and give the words their ordinary meaning." *State v. Wilson*, 471 Md. 136, 160 (2020).

Black's Law Dictionary defines "enforce" as, among other things, "[t]o give force or effect to (a law, etc.); to compel obedience to." *Enforce*, Black's Law Dictionary (12th ed. 2024); *see also Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 565 n.78 (2015) (defining "enforce" as "[t]o give force or effect to (a law, etc.)" in accordance with Black's Law Dictionary). Similarly, Merriam Webster defines "enforce" as "to give force to." *Enforce*, Merriam Webster (2024), available at https://perma.cc/B96P-H4JJ.

Based on the ordinary meaning of "enforce," as shown in these dictionary definitions, the Homeowners appear to be on solid footing in arguing that the Sellers are attempting to "enforce" the contractual limitations period here. That is, the Sellers are

31

attempting to give effect to the contractual limitations period by invoking it in support of their defenses based on timeliness. Indeed, we have previously used "enforceable" to describe a defendant's invocation of a contractual limitations provision in support of a defense based on timeliness. In *Ceccone v. Carroll Home Services, LLC*, homeowners brought tort and contract claims against a furnace maintainer with whom they had contracted for service. 454 Md. 680, 684 (2017). Similar to the contracts at issue here, a provision in the pertinent contract shortened the period during which a consumer could bring a claim against the maintenance company from the default three-year statute of limitations. *Id.* As in this case, the defendant invoked the contractual limitations clause in arguing that the homeowners' claims were untimely. *Id.* at 688. We held that "a contractual provision that purports to shorten the statutorily-prescribed time for bringing a civil action is *enforceable* only if: (1) there is no statute to the contrary; (2) the provision is not the product of fraud, duress, misrepresentation, or the like; and (3) the provision is reasonable in light of all the circumstances." *Id.* at 698 (emphasis added).

The Sellers argue that there is a difference between invoking a contractual provision as part of a defense to a legal claim and "enforcing" a contractual provision affirmatively in support of one's own claim. With respect to the latter scenario, they acknowledge the "general rule, based upon principles of public policy, that the courts will not permit an unlicensed party to enforce a contract where the services for which compensation is sought are dependent upon a license that is regulatory in nature." *Velicky v. Copycat Bldg. LLC*, 476 Md. 435, 473 (2021). Thus, the Sellers concede that they are barred from filing suit against the Homeowners to enforce the terms of the sales contracts. They acknowledge that

32

filing such affirmative claims would constitute an attempt to "enforce" the contracts that is impermissible under Maryland common law, as explained in *Velicky* and other cases.[12] They contend that, in enacting BR § 4.5-605, the General Assembly intended only to codify this common law principle as applied to contracts for the sale of new homes.

According to the Sellers, when they invoke the contractual limitations period as part of their *defense* of the lawsuits filed by the Homeowners, they are not attempting to "enforce" that contractual provision. They analogize this case to *CitaraManis v. Hallowell*, 328 Md. 142 (1992). In *CitaraManis*, the plaintiffs sued their former landlords after learning that the home they had rented was not licensed as rental property by Howard County. *Id.* at 145. The condition of the home during the rental period had been acceptable to the plaintiffs, and the defendants had made minor repairs to the property as needed. *Id.* Nevertheless, the plaintiffs sought damages under the MCPA – specifically, restitution of the 18 months' rent they had paid to the defendants under the terms of the lease. *Id.* This Court rejected the plaintiffs' argument that they were entitled to restitution of the rent due to the failure of the defendants to properly license the property. *Id.* at 158. We held that was the case because the plaintiffs had received everything that they bargained for, "and a necessary element justifying the remedy of restitution, *i.e.*, unjust enrichment, [was] lacking." *Id.* at 159.

---

[12] In *Velicky*, we cited *McDaniel v. Baranowski*, 419 Md. 560 (2011), *Harry Berenter, Inc. v. Berman*, 258 Md. 290 (1970), *Snodgrass v. Immler*, 232 Md. 416 (1963), and *Goldsmith v. Mfr.s' Liab. Ins. Co. of N.J.*, 132 Md. 283 (1918), as examples of cases where this Court applied the common law bar on affirmative enforcement of a contract by unlicensed entities. *See Velicky*, 476 Md. at 473-74.

*CitaraManis* is distinguishable from this case. The defendants in *CitaraManis* did not have to invoke any provision of the lease in defending against the plaintiffs' claims. Rather, this Court held that the plaintiffs (at the summary judgment stage) had not established an element of their cause of action under the MCPA: actual damages. *See id.* at 152-55. The Sellers are not arguing at this point that the Homeowners have failed to establish the elements of their causes of action under the Disclosure Act. Rather, they are arguing that, even if there may be merit to the Homeowners' claims, the claims are untimely under the terms of the contracts. Thus, the Sellers are affirmatively invoking provisions of the contracts – in other words, seeking to enforce the contracts – in a way that the defendants in *CitaraManis* did not.

Second, even if the enforceability of the lease could be considered implicitly at issue in *CitaraManis*, no statute made a lease for an unlicensed property unenforceable. Rather, the plaintiffs in *CitaraManis* relied on the general rule developed in common law breach of contract cases that

> if a statute requiring a license for conducting a trade, business or profession is regulatory in nature for the protection of the public, rather than merely to raise revenue, an unlicensed person will not be given the assistance of the courts in enforcing contracts within the provisions of the regulatory statute because such enforcement is against public policy.

*Harry Berenter, Inc. v. Berman*, 258 Md. 290, 293 (1970); *CitaraManis*, 328 Md. at 158 (noting the plaintiffs' reliance on *Harry Berenter* and similar cases). As we explained in *Velicky*, the determination as to whether public policy prohibits enforceability in this context requires application of a balancing test:

34

> If a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if
>   (a) the requirement has a regulatory purpose, and
>   (b) *the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement.*

*Velicky*, 476 Md. at 467 (quoting Restatement (Second) of Contracts § 181, cmt. a (Am. Law Inst. 1981)) (emphasis added).

Here, there is a statute – BR § 4.5-605 – that expressly and categorically makes a contract for the performance of any act for which a home builder registration number is required unenforceable by an unregistered home builder.[13] The statute does not incorporate any balancing test to determine whether enforcement of the contract is against public policy. Rather, the General Assembly has declared in BR § 4.5-605 that the public policy of Maryland is not to allow an unregistered home builder to enforce a contract like the ones at issue here. We therefore conclude that, in enacting BR § 4.5-605, the General Assembly abrogated Maryland's common law of contracts to the extent it otherwise might permit an unregistered home builder to invoke a contractual provision in defense of a claim brought

---

[13] The parties agree that a contract within the scope of BR § 4.5-605 is not rendered void as a result of a party failing to register as a home builder. That is our interpretation as well. Despite the absence of language in BR § 4.5-605 expressly stating by whom the contract is "not enforceable," we interpret that provision not to prohibit a purchaser from enforcing a contract for a new home due to the failure of a counterparty home builder to register under the HBRA. The contract referred to in BR § 4.5-605 is a contract for the performance of any act for which a home builder registration number is required, and the act that results in non-enforceability is the home builder's failure to register. Thus, if a contract is not enforceable under BR § 4.5-605, it cannot be due to any act or omission of the purchaser. It stands to reason, then, that a contract referred to in § 4.5-605 is unenforceable only by a home builder, not a purchaser.

against it. *See Harris v. State*, 479 Md. 84, 101 (2022) (discussing conflict preemption of the common law by new legislation).[14]

As discussed above, the Sellers were required to register as home builders before agreeing to provide new homes to the Homeowners and before accepting deposits from the Homeowners. The Sellers failed to do so. It follows that, under BR § 4.5-605, the one-year contractual limitations periods in the Sanders Contract and the Lindsey Contract are not enforceable by the Sellers. That means the Sellers may not invoke that contractual provision in defending against the Homeowners' claims for violations of the Disclosure Act.[15] It follows that the Homeowners timely filed their claims.[16]

---

[14] We recognize that implied preemption of the common law is "highly disfavored." *WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. 244, 258 (2018). However, the General Assembly's declaration of public policy in BR § 4.5-605 leaves no room in this context for the common law's more flexible approach, based on arguments concerning public policy, to judicial determinations of contract enforceability.

[15] In its brief as *amicus curiae*, the Maryland Building Industry Association ("MBIA") argues that interpreting BR § 4.5-605 to preclude unregistered home builders from defensively invoking contractual provisions would improperly allow homeowners to pick and choose which provisions in fully executed contracts will remain enforceable. MBIA posits that this could lead to homeowners obtaining disgorgement of the entire purchase price of their homes, even as they continue to own their homes with which they are satisfied, if they discover that a party to their sales contract was an unregistered home builder. We find that possibility far-fetched. In such an instance, while an unregistered home builder could not invoke the contract as a defense to such a claim, we see no reason why the home builder would be precluded from arguing that the homeowner would be unjustly enriched if a court were to order disgorgement of the purchase price while the homeowner retained ownership of the home.

[16] Thus, we agree with the Appellate Court's conclusion regarding timeliness, but for different reasons.

# IV

## Conclusion

The Homeowners' claims for violations of the Disclosure Act accrued at the time of contracting, not at the time of settlement. Because the Homeowners filed their claims more than one year after they entered into their contracts, their claims would be barred by the contractual one-year limitations period if the Sellers were permitted to enforce the contracts against the Homeowners. However, the Sellers may not enforce those contracts. The Sellers acted as "home builders" under the HBRA when they agreed to provide new homes to the Homeowners and when they accepted the Homeowners' deposits. The Sellers did so without having registered as home builders under the HBRA. The fact that a registered home builder was also a party to the contracts did not negate the Sellers' statutory obligation to register as home builders. Under BR § 4.5-605, the Sellers may not enforce the one-year contractual limitations period in defense of the Homeowners' claims under the Disclosure Act. Thus, the Homeowners timely filed their claims within the default three-year statute of limitations set forth at CJP § 5-101. The circuit court erred in dismissing those claims as time-barred.

> **JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED IN PART AND REVERSED IN PART. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**